UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| *Sky Grocery, LLC,* <br> *Plaintiff,* <br> *v.* <br> *United States Department of Agriculture – Food and Nutrition Service,* <br> *Defendant.* | Civil No. 3: 15-cv-1082(JBA) <br><br> March 20, 2017 |

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Sky Grocery, LLC ("Sky"), a convenience store in Hartford, Connecticut, commenced the instant action pursuant to 7 U.S.C. § 2023(a)(13)-(15) and 7 C.F.R. § 279.7, against the United States Department of Agriculture—Food and Nutrition Services ("FNS" or the "Agency") challenging Sky's permanent disqualification from participation in the Supplemental Nutrition Assistance Program ("SNAP" or the "Act"). FNS disqualified Sky after it concluded that Sky had engaged in "trafficking" as defined by 7 C.F.R. § 271.2 which includes the exchange of SNAP benefits for cash. The United States now moves [Doc. # 18] for summary judgment, affirming the validity of the Agency's decision to disqualify Sky from participation in SNAP and rejecting Plaintiff's claims that the sanctions imposed were arbitrary and capricious or that Plaintiff's due process rights were violated. For the reasons articulated below, the Court grants Defendant's Motion for Summary Judgment.

I. **Background**

A. **The Statutory and Regulatory Regime**

Congress established SNAP (7 U.S.C. § 2011 *et seq.*, 7 C.F.R. § 271.1 *et seq.*) as a means of "alleviat[ing] hunger and malnutrition" by providing qualified households with food stamps that increase the funds those household have to spend on authorized food items at participating retail

food stores. 7 U.S.C. §§ 2011, 2013(a), 2016(b); 7 C.F.R. § 274.2. The Act and regulations authorize FNS to administer the program. *See* 7 C.F.R. § 271.3.

SNAP benefits are delivered through Electronic Benefit Transfer ("EBT") cards that work similarly to ATM cards. (Sweezy Aff., Ex. 1 to Mot. Summ. J. [Doc. # 18-1] ¶ 8.) At the beginning of each month, a SNAP recipient's card is credited with a dollar amount of SNAP benefits which can then be used at authorized retail food stores to purchase eligible food items. (*Id.* ¶ 9.) The amount of each purchase is deducted from the card-holder's monthly allotment and credited to the retail store owner's bank account. (*Id.* ¶ 10.)

SNAP regulations prohibit stores from "trafficking," which the regulations define to include "the buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards . . . for cash or consideration other than eligible food . . . ." *See* 7 C.F.R. §§ 278.2(a), 271.2. For example, trafficking occurs when a store charges $25 to a customer's EBT card, the cashier then gives the customer a $20 bill, and the store retains the difference.

The Act instructs the Agency to establish regulations for finding violations "on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an electronic benefit transfer system." 7 U.S.C. 2021(a)(2). At issue in this case is whether "transaction reports" are sufficient, without direct evidence of trafficking conduct, to warrant the conclusion that a violation has occurred.

Under the statute and regulations, FNS may conduct an investigation and, when it finds that a retail store has engaged in trafficking, it may permanently disqualify that store from

participating in SNAP. 7 U.S.C. §2021(b); 7 C.F.R. 278(e)(1).[1] The process by which a store is permanently disqualified proceeds through several steps: after detecting irregular transaction patterns through monitoring of EBT transactions or other evidence, FNS sends the suspected store a charge letter that specifies the basis on which FNS believes a violation has occurred. 7 C.F.R. 278(b)(1). The store is afforded a chance to respond with information, explanation and evidence. *Id.* After that response, FNS makes an initial finding. *Id.* The store may then request administrative review by an Administrative Review Officer (an "ARO") who renders the final decision of the Agency. 7 C.F.R. 279, Part A.

After receiving notice of the Agency's final decision, a store is entitled to seek judicial review in either federal or state court. 7 C.F.R. 279, Part B. Such judicial review takes the form of a trial *de novo*. *Id.*

**B.     Factual Background**

Sky is a retail convenience store located in Hartford, Connecticut that is solely owned by Ms. Alejandra Perdomo. (Administrative Record ("AR") at 1, 3.) The store opened in 2013 and was authorized to participate in the SNAP program in early 2014 after successful completion of an application process that included an in-store inspection. (AR at 3, 9-41, 64.) The store is approximately 1280 square feet and stocked with a range of "inexpensive food items such as canned goods, cereals, juice, pasta, rice, ramen noodles, beans and a variety of snack items. The coolers are stacked with packed meat items, cheese, milk and eggs." (AR at 68.) Photos taken during the

---

[1] While the statute refers to a "retail food store" or a "wholesale food concern," the regulations group both generically under the term "firm." This Ruling refers to Sky as a "store" or a "retail store" for simplicity's sake. There is no dispute that Sky is a retail food store for purposes of the statute and the regulations.

authorization inspection and the investigation show shelves that are well-stocked with canned goods, dry goods, snack foods and cereals and a small amount of fresh produce, but no fresh meat. (AR at 28-41, 66-67.) The store also has a deli area in which hot food is prepared and sold for off-premise consumption. In addition, the store sells many non-food items, including tobacco products, alcohol, cleaning products, paper products, lottery tickets, and pet food. (AR at 68.) These items are not eligible for purchase with SNAP benefits.

FNS commenced investigation into Sky in the spring of 2014 after the computerized EBT ALERT system that FNS uses to monitor authorized retail stores showed patterns of purchase indicating possible trafficking violations. (AR at 64.) Because of these suspicious patterns, FNS analyzed EBT SNAP transaction data for the months of June, July, August, September, October, and November 2014. Analysis of the data produced two separate findings of suspicious transactions: (1) a large number of households that completed multiple transactions within a 24-hour period, and (2) a large number of high-dollar-amount purchases.

In its initial analysis of the case, FNS stated that "[m]ultiple transactions conducted within a 24 hour period are methods which stores use to avoid single high dollar transactions that cannot be supported and are suggestive of trafficking." (AR at 68.) In the first group, the analysis uncovered 52 transaction pairs or triplets (110 individual transactions total, most in pairs) completed by 38 households within a 24-hour period that ranged in total value from $100.38 to $263.22. (AR at 82-88.) For example, one household made an initial purchase of $100.39 at 7:29 AM on September 2, 2014 and then a second purchase for $38.99 two hours later at 9:30 AM. Another household made a purchase for $57.69 at 2:11 PM on September 4, 2014, a second purchase for $42.14 at 7:19 PM, and then a third purchase for $81.21 the next morning at 8:50 AM.

4

In the second group, the analysis uncovered 790 individual EBT transactions, ranging from $35.25 to $165.25 "that exceeded the average transaction for the same store type (convenience store) in the same state by at least 300%." (AR at 218.) Of those, 94 transactions exceeded $100. After conducting a site visit, FNS concluded "there is no apparent legitimate reason for these high transaction amounts at [Sky] given the limited stock and variety of eligible foods and the fact that tobacco, alcohol, paper products, household items, pet food and hot foods are not eligible for purchase with SNAP benefits." (AR at 218.)

Because of these suspicious transaction records, FNS conducted further investigation: (i) it performed a site visit on November 5, 2014 to determine if the store's stock could support or explain these transactions and to observe regular business during the busy period early in the month; (ii) it compared Sky's EBT transaction records to nearby stores; and (iii) using EBT data, it examined household purchasing patterns for families that shopped at Sky and elsewhere.

The site visit supported FNS's initial suspicion that the transaction records were suggestive of trafficking. With respect to the paired transactions within 24 hours, the site inspection led the case investigator to conclude that

> The store is not large enough for customers to consider Sky Grocery as a first choice destination to fulfill large and multiple purchases of food. The store does not have fresh meat and only has a small amount of fresh vegetables and fruit.

(AR at 68.) With respect to the second set of suspicious transactions—high dollar value purchases—the case investigator reported that

> The store does not have any expensive food items that would justify large purchases. The store has mostly inexpensive food items as well as non-food items. SNAP recipients do not have a compelling reason to purchase large amount of food items from this store. The store does not have shopping carts or baskets for households to transport their large purchases to the register area. Moreover, the checkout area is not capable of processing large transactions due to its limited space. This is very

unusual and highly unlikely and a strong indicator that trafficking may be occurring.

(AR at 69.)

In addition to the site visit, FNS compared Sky's transaction data with nearby stores. Noting that there were 26 convenience stores, 15 grocery stores and 4 superstores/supermarkets within a one-mile radius, FNS compared Sky's EBT transaction data to six convenience stores within a one-mile radius (one as close as 1/10th of a mile; the others just over ½ mile away) and to statewide averages for convenience stores. (AR at 70.) These comparisons revealed that Sky "had an average transaction amount of $18.85 during the review period while the 6 other convenience stores had a combined averaged transaction amount of $4.52." *Id.* In addition, FNS observed that Sky

> had a higher total purchase transaction count and a high dollar volume compared to other convenience stores in the State of Connecticut. . . . Sky Grocery store had an average transaction amount of $18.85 during the review period while other convenience stores in the state had an average transaction amount of $8.95.

(AR at 74.)

Further, whereas Sky had 52 paired transactions within 24 hours that triggered FNS's ALERT system, the convenience store 1/10th of a mile away had only four such transactions, another had two such transactions and the remaining four comparator convenience stores had no such paired transactions. (AR at 217-18.) Likewise, whereas Sky had 790 high dollar value transactions, its neighbors had 39, 15 and 7 respectively at three nearby stores and 0 at the remaining three. (AR at 218.)

FNS also surveyed the EBT purchases of select households that shopped at Sky and observed that households frequently made large purchases at chain grocery stores like Walmart or Stop & Shop, but that they also make significant purchases at Sky on the same day or within a day

or two. (AR at 75-77.) For example, one household made purchases on June 2, 3, and 4 at Sky for $99.52, $59.02 and $64.37 respectively and then, again on June 4, spent the remaining $424.04 of its monthly allotment at Save-a-Lot. (AR at 76.) The investigator noted that such behavior "indicates that households in the area have access to larger stores and do not depend on the subject store for their major food needs." (AR at 75.) The investigator again noted that Sky lacked the amenities—carts or shopping baskets—to make it easy to make large purchases and that the store did not stock more expensive food items like fresh meat or fresh produce. (*Id.*)

The FNS concluded that based on the store visit and analysis of transaction data, "clear and repetitive patterns have been established of unusual, irregular, and inexplicable SNAP activity. The combined ALERT Scan data, the ALERT Comparison Reports, and the State Admin Terminal household data support the evidence that trafficking occurred at the subject store." AR at 78.

FNS sent a Charge Letter by UPS to Sky Grocery on February 6, 2015 informing it that FNS had compiled evidence showing that Sky had violated the SNAP regulations. The letter focused on the two sets of questionable transactions—multiple transactions within a short time frame and high dollar value purchases—and explained that "if it is determined that your firm committed trafficking violations noted above, it will be permanently disqualified from" SNAP. (AR at 79.) The letter provided citations for the regulations governing trafficking and the procedure that Sky should follow to "present any information, explanation or evidence you have regarding these charges . . ." and notified Sky of its opportunity to seek counsel before responding. (AR at 80.) The letter appended complete records of all the questionable transactions. (AR at 102.) The UPS tracking sheet indicated the letter was delivered on February 11, 2015 and signed for at Sky by

"Aribel." Sky never responded to this letter and stated in subsequent correspondence that it never received the letter.[2]

On March 26, 2015, FNS sent a second letter stating that on the basis of the evidence available, the violations described in the charge letter had occurred and informed Sky of its permanent disqualification from participation in SNAP effective upon receipt of the letter. (AR at 104.) The letter explained the procedure by which Sky could seek review from the Chief Administrative Review Branch, which it timely requested by letter dated March 31, 2015, stating that "I had never received the letter that was supposedly sent on February 6, 2015. I have the evidence necessary to show I did not violate or commit any fraudulent activities . . . ." (AR at 108.)

In correspondence with FNS, Sky offered two explanations for the transaction data results: first, it explained that

> We provide business mostly to the same customers each month. It is not uncommon for our customers to not use their full amount of deposit in just one day; therefore it is not unusual for our customer[s] to come and create a different transaction the next day."

(AR at 114.) Further, with respect to the high cost transactions, Sky noted that its customers

---

[2] The Administrative Review Officer notes in her final determination that:

[t]he case file includes evidence that the Charge letter was delivered to the Firm on February 11, 2015 at 10:07AM and was signed by "Aribel," a copy of the signature was provided. Likewise the firm received the Determination letter March 31, 2015 at 9:53 AM and was signed for by "Mary Well," again with a copy of the actual signature. Both signatures appear identical. This appears to be the same person who completed the store visit review consent form and signed such as "M.D." on January 30, 2014. This store worker gave her title as cashier and wrote under "Firma" the word "Maribel."

(AR at 221.)

come to take advantage of our food combos. . . . This is also the main reason why many of the amounts in our transactions are repeated, and some might even be high. Our combos are based on the most used items families consume on a daily basis and we base them mostly as items that are SNAP eligible to make the consum[ption] and sales of these products higher.

(AR at 115.)

Sky provided flyers for several sets of combos it claims were offered, including a flyer with four different "Baby Specials" ranging in price from $20.00 for three boxes of cereal, a half-gallon container of milk, three 64 oz. juice bottles and one bag of bananas to $95.00 for four cans of Enfamil infant formula, three boxes of baby cereal, twelve cans of Beech Nut baby food, and three 64 oz. juice bottles; and a flyer with two "Super Specials" for $125 and $147 for fifty lbs. bag of rice, ten lbs. of chicken, four lbs. ribs, one three-quart bottle of corn oil, four two-liter bottles of soda, five boxes of cereal, one box of crackers, one box of pancake mix and syrup, four cans of corned beef, one can of olives, one can of tomato paste, and one box of Sazon. (AR at 144-146.) These flyers were all in English. No Spanish-language flyers were submitted despite Ms. Perdomo's description of the specials in her affidavit in support of the current suit asserting that "I have specials at my store of large bags of rice and related Spanish grocery items that my customers desire" and that apparently target Spanish-speaking clientele. (Ex. A ("Perdomo Decl.") [Doc. # 22-1] to Opp'n. Summ. J. ¶11.)

Sky also submitted quarterly cost of goods reports for the second, third, and fourth quarters of 2014 (AR at 147-149), its Connecticut sales tax reports (AR at 150-155),[3] bank statements for

---

[3] Sales tax cannot be charged on items purchased with SNAP benefits.

Sky (AR at 156-207), invoices for vendors that listed both SNAP-eligible and SNAP-ineligible products, and several further tax forms.

After review of this full record, Administrative Review Officer Madeline Viens (the "ARO" or "Ms. Viens") analyzed the two ALERT reports evidencing suspicious transactions. With respect to the multiple transactions within 24 hours, she noted that "it is not a usual shopping pattern to see so many purchases in less than a 24 hour period, by different households, as documented in this Attachment." (AR at 216.) She noted that the items stocked in the store did not make it a likely first shopping destination and that the absence of baskets or carts made it unlikely that customers could carry the volume of items necessary for purchases in the recorded amounts to the cash register. (*Id.*)

The ARO considered Sky's explanations, but rejected them because the site investigation did not reveal any signage regarding the specials, the store inventory report did not contain any indication of combos being offered and the specials that Sky claimed were driving the high purchase prices did not match the dollar amounts of the high-dollar transactions. (*Id.*) She observed that the sheets advertising food combos had no dates and could be easily produced by a home computer and noted that the invoices submitted did not explain the level of SNAP redemptions. (*Id.*) Additionally, Sky did not appear to actually sell some of the items listed in the specials: there was no evidence of fresh ribs or chicken being sold, nor did the site investigator observe 50 lb. bags of rice. The ARO also noted Sky's failure to produce itemized receipts showing that the challenged transactions were legitimate.

Plaintiff timely brought suit seeking review of the ARO's decision. Plaintiff supplemented the administrative record with the affidavit of Alejandra Perdomo to support its opposition to Defendant's Motion for Summary Judgment. In that affidavit, Ms. Perdomo asserts that she has

"first hand knowledge of the transactions listed in the February 6, 2015 letter" because she was working the cash register when they occurred, and asserts that "the transactions listed in the February 6, 2015 letter are legally permitted transactions of the sale of SNAP eligible items in exchange for SNAP EBT payments and did not involve the exchange of cash or other consideration for EBT benefits." (Perdomo Decl. ¶¶ 6-7.) She further avers that "at the beginning of the month when SNAP benefit accounts are funded I have specials at my store of large bags of rice and related Spanish grocery items that my customers desire and that they make larger purchases of these items when they have the funds available . . . ." (*Id.* ¶ 11.) Plaintiff did not submit any further affidavits or other evidence disputing Defendant's factual record supporting its Motion for Summary Judgment.

## II.   Legal Standard

### A.   *De Novo* Review

A retailer aggrieved by a final determination of a disqualification from SNAP "may obtain judicial review thereof by filing a complaint against the United States in the United States court for the district in which it resides or is engaged in business . . . requesting the court to set aside such determination." 7 U.S.C. § 2023(a)(13). "The suit in the United States district court or State court shall be a trial *de novo* by the court in which the court shall determine the validity of the questioned administrative action in issue." 7 U.S.C. § 2023(a)(15).

"In a trial *de novo*, the record in the district court, not the record before the agency, is what counts." *Ibrahim v. U.S. Through Dep't of Agric.*, 834 F.2d 52, 54 (2d Cir. 1987) (interior citations and alterations omitted). The district court is required "to reexamine the agency's decision on a fresh record, rather than determining whether the administrative decision was supported by substantial evidence." *Id.* "As a result, the district court must reach its own factual and legal

conclusions based on the preponderance of the evidence, and should not limit its consideration to matters previously appraised in the administrative proceedings." *Id.* at 53–54. In light of the requirement for *de novo* review, the Court will consider the Perdomo Affidavit in addition to the record evidence in consideration of Defendant's Motion for Summary Judgment and Plaintiff's opposition.

"Summary judgment has been held to be appropriate on *de novo* judicial review of a disqualification of a retail food store from participating in the food stamp program if no genuine issue of material fact exists." *Kassem v. United States*, No. 02-cv-546E(F), 2003 WL 21382906, at *2 (W.D.N.Y. Apr. 15, 2003); *see also Nadia Int'l Mkt. v. United States*, No. 14-cv-82, 2015 WL 7854290, at *4 (D. Vt. Dec. 2, 2015), *appeal dismissed* (July 28, 2016) (granting defendant's motion for summary judgment after plaintiff sought judicial review of FNS's decision to permanently disqualify plaintiff from participation in SNAP program). "[T]o defeat summary judgment, Plaintiffs must submit evidence from which a reasonable juror could conclude that the agency's determination is invalid with respect to each cited instance of trafficking." *Duchimaza v. United States*, No. 3:14-CV-00887 (MPS), 2016 WL 5799295, at *7 (D. Conn. Sept. 30, 2016).[4]

---

[4] Summary judgment is appropriate where, "resolv[ing] all ambiguities and draw[ing] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When considering a motion for

**B.      Burden of Proof**

While the Second Circuit has yet to explicitly address the question of who bears the burden of proof in these cases, the decision in *Ibrahim*, which required plaintiff to prove his case by a preponderance of the evidence, clearly suggests that the party seeking review of the agency decision bears the burden of proof. District courts within the Circuit, as well as other Courts of Appeals, have held that "[p]laintiffs, as the parties challenging their permanent disqualification from SNAP, bear the burden of proving by a preponderance of the evidence that the agency's action was invalid." *Arias v. United States*, 13-cv-8542(HBP), 2014 WL 5004409, at *6 (S.D.N.Y. Sept. 29, 2014) (*citing Hernandez v. U.S. Dep't of Agric. Food & Consumer Serv.*, 961 F. Supp. 483, 485 (W.D.N.Y. 1997).[5]

**III.    Discussion**

**A.      Subject Matter Jurisdiction**

---

summary judgment, the Court may consider depositions, documents, affidavits, interrogatory answers, and other exhibits in the record. Fed. R. Civ. P. 56(c).

[5] *See Redmond v. United States*, 507 F.2d 1007, 1011–12 (5th Cir. 1975):

By rejecting the substantial evidence standard of review in the Food Stamp Program and permitting a trial de novo, Congress intended nothing more than that the district court would not be bound by the administrative record. But by requiring the aggrieved store to file a complaint in the district court requesting the court to set aside the agency determination, the Act casts the burden of being the plaintiff on the aggrieved store . . . In other words, the agency action stands, unless the plaintiff proves that it should be set aside. He may offer any relevant evidence available to support his case, whether or not it has been previously submitted to the agency, and the agency itself may offer any evidence available to support its action, whether or not in the administrative record. But unless proven to be invalid, the agency action prevails.

As an initial matter, the United States argues that Plaintiff has sued the wrong party and that, therefore, this Court lacks subject matter jurisdiction. Under the Act, an aggrieved party must file "a complaint against the United States . . . " to obtain judicial review. 7 U.S.C. 2023(a)(13). Here, however, the named defendant in Plaintiff's suit is the "United States Department of Agriculture – Food and Nutrition Service" and Plaintiff served "named Defendant: United States Department of Agriculture."[6] (*See* Proof of Service [Doc. # 7].) Accordingly, Plaintiff has not sued the proper party and this action will be dismissed for lack of subject matter jurisdiction. In the event that such determination is found to be error, the Court's alternative reasoning for dismissal follows.

## B.   Finding of Trafficking

Defendant moves for summary judgment, claiming there is no material issue of fact about the finding of trafficking. (Mem. Supp. Mot. Summ. J. [Doc. # 19] at 19.) Plaintiff opposes, arguing that "there is no claim or evidence by the Defendant that it has any direct evidence that the Plaintiff engaged in trafficking. . . . There has not been any showing or claim of any witness to alleged trafficking or any video surveillance or informant testimony." (Mem. Opp'n. [Doc. # 22] at 3.)

To show a material issue of fact, Plaintiff cites the material already in the administrative record, including the advertisements for the combo sheets, and submits the Declaration of

---

[6] Plaintiff served the USDA in four different ways: via the United States Attorney's Office in New Haven, Connecticut, the United States Attorney General in Washington, D.C., the U.S.D.A itself via its Secretary, Tom Vilsalk (sic), and via the U.S.D.A. Regional Office in Boston, MA.

Alejandra Perdomo, which claims first-hand observation as the cashier that "the transactions listed in the February 6, 2015 letter are legally permitted transactions of the sale of SNAP eligible items in exchange for SNAP EBT payments and did not involve the exchange of cash or other consideration for EBT benefits." (Perdomo Decl. ¶ 7.)

FNS is authorized to disqualify any authorized retail store from participation in the program for engaging in trafficking, and "such disqualification shall result from a finding of a violation on the basis of evidence that may include facts established through on-site investigations, inconsistent redemption data, [or] evidence obtained through a transaction report under an electronic benefit transfer system. . . ." 7 C.F.R. § 278.6.

EBT transaction reports may provide sufficient circumstantial evidence of trafficking. For example, in *Idias v. United States*, 359 F.3d 695 (4th Cir. 2004), the Plaintiff unsuccessfully challenged on appeal the district court's reliance on EBT transaction reports showing "a clear and repetitive pattern of unusual, irregular, and/or inexplicable" transactions. The Fourth Circuit found:

> [T]he United States was entitled to use this sort of documentary evidence to prove that Idias trafficked in food stamps. . . . [FNS has issued] regulations that permit a food store to be disqualified from the Food Stamp Program on the basis of 'inconsistent redemption data' or 'evidence obtained through [an EBT] transaction report.' Indeed, one of the advantages of replacing traditional paper food stamps with the EBT system was that it made it easier to detect trafficking, particularly in more closely-knit communities where undercover evidence can be difficult and costly to obtain.

*Idias v. United States*, 359 F.3d 695, 698 (4th Cir. 2004) (interior citations omitted). Similarly, in *Kahin v. United States*, the district court rejected Plaintiff's claim that "summary judgment is inappropriate without evidence of 'red-handed' violations," concluding that the statute clearly

contemplated reliance on EBT data as evidence supporting a finding of trafficking. 101 F. Supp. 2d 1299, 1303-04 (S.D. Cal. 2000).

In this Circuit, district courts have granted summary judgment on the basis of EBT data. For example, in *Nadia International Market*, the court first noted that "[t]he governing statute and regulation permit the Agency to base its final determination of SNAP Program violations on analysis of EBT transactions reports, redemption data analysis, and a field officer's report" and then granted summary judgment on the basis of ALERT reports of suspicious transactions and plaintiff's failure to substantiate his alternative explanation of the transactions that appeared in those reports. *Nadia Int'l Mkt.*, 2015 WL 7854290, at *5 (D. Vt. Dec. 2, 2015). In *Duchimaza*, the court found that "the Government may permanently disqualify a retailer on the basis of EBT data" and that the Plaintiff's effort to contest the validity of disqualification based on a computer generated printout of statistics must fail. *Duchimaza*, 2016 WL 5799295, at *8.

In this case, Plaintiff modifies this argument slightly, arguing that the regulations do not prohibit multiple transactions within short time frames or excessively large transactions, and in fact prohibit a store from establishing minimum charge limit or maximum limit on the number of transactions. (Mem. Opp'n. at 4.) Plaintiff then argues that because the regulations permit repeated transactions and permit high-dollar-amount transactions, such transactions cannot "constitute" trafficking. (*Id.*) But Plaintiff conflates evidence with legal conclusion and mischaracterizes the evidence on which FNS relied. The transaction records themselves do not constitute trafficking, but the patterns they reveal may support FNS's conclusion that Sky engaged in trafficking.

In any event, FNS did more than rely on EBT transaction records. It conducted an on-site visit during early November, 2014, and found no evidence that the combo specials Plaintiff uses to explain the high dollar value transactions were actually advertised, and it found no evidence that

the store actually sold the chicken or ribs that were included in the combos. FNS also noted that the prices of the combo specials did not match up with the high-dollar-value transactions. The Final Agency Determination found that not a single high dollar value transaction, of the 790 isolated, matched the advertised prices for the various specials, although two come close. (AR at 218.) As Ms. Viens reasoned, "if these combos were driving Appellant's business volume as contended, these combo amounts would be expected to be seen more frequently on both" EBT reports. (*Id.*) This evidence suggested that Sky did not actually sell the combo specials. FNS also conducted comparisons with nearby stores that demonstrated wide disparities between the volume and dollar value of transactions at Sky vis-à-vis its competitors. Finally, FNS inspected total household spending patterns for families that did some shopping at Sky and concluded that those patterns were better explained by trafficking than any other explanation.

Plaintiff attempts to raise a material issue by asserting that 90% of Sky's customers live within walking distance and that they return to the store several days in a row at the beginning of the month, explaining the paired transactions. However, Plaintiff's explanation, unsupported by affidavits or other evidence, is insufficient for a fact-finder to find in Plaintiff's favor in light of FNS's evidence that Sky had 52 such paired transactions but the convenience store 0.11 miles away had only four such transactions, another comparator in close proximity had two, and the remaining four comparators had none.

Where, as here, the nonmoving party bears the burden of proof at trial, "the movant may show prima facie entitlement to summary judgment in one of two ways: (1) the movant may point to evidence that negates its opponent's claims or (2) the movant may identify those portions of its opponent's evidence that demonstrate the absence of a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). Here, the United States has pointed to evidence in

the record that negates its opponent's general claims, shifting the burden to Sky to "point to record evidence creating a genuine issue of material fact." *Id.* (citing Fed. R. Civ. P. 56(e).)

Sky fails to do this. Its attempt to explain the evidence of high dollar amount transactions by means of its proffered combo special flyers is undermined by the site visit, which found no evidence that the specials were offered or that all the items were even available for sale, and by the transaction price records, which did not match the price of the specials. Sky's assertions about the shopping habits of its customers is insufficient to rebut the FNS's comparison of Sky's transaction records with those of its competitor convenience stores.

Finally, Sky offers the unsubstantiated affidavit of its owner stating that trafficking did not occur, but "Plaintiffs' affidavits on this point lack specifics and are conclusory; a party cannot create a triable issue of fact merely by stating in an affidavit the very proposition they are trying to prove." *Hicks v. Baines*, 593 F.3d 159, 167 (2d Cir. 2010); *see also Fletcher v. Alex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("[C]onclusory allegations . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." (internal quotation marks omitted)).

Even if conclusory statements were sufficient, Ms. Perdomo's affidavit "merely presents general justifications for the statistically unusual EBT transactions," but such general justifications are insufficient where "only one instance of . . . trafficking is sufficient to establish a violation." *Nadia Int'l Mkt.*, 2015 WL 7854290, at *7 (granting summary judgment where Plaintiff challenged exclusion on the basis of ALERT records where Plaintiff explained that he regularly extended credit to customers and presented a ledger book recording those transactions in support of that practice). Plaintiff has not offered receipts for any of the challenged transactions and has not introduced any customer affidavits to explain any of the transactions FNS identified. The invoices fail to support Ms. Perdomo's affidavits. Given the narrow range of eligible products sold at Sky, the lack of space

18

at the register, the fact that its customers often shop at full range grocery stores nearby, and the fact that its comparators have so many fewer transactions, the volume and amount of sales at Sky are strongly probative of trafficking. Sky has not offered evidence which shows a dispute of material fact with respect to Defendant's factual record and summary judgment imposing liability on Plaintiff for trafficking is appropriate.

C.    **Violation of Due Process**

Plaintiff alleges that its due process rights were violated because its privileges were revoked without notice and an opportunity to be heard, because the statute is vague, and because plaintiff was not aware that high-dollar-value transactions or paired transactions are forbidden. Defendant moves for summary judgment on these allegations.

In this Circuit, a "rational basis standard of review is applied in substantive due process claims where the legislative act at issue does not infringe upon a fundamental right." *Lugo v. United States*, 2009 WL 928136, at *4 (S.D.N.Y. Mar. 30, 2009). The *Lugo* court then found that disqualification from the program did not infringe on a fundamental right. *See also Nagi*, 1997 WL 252034, at *3 (finding same).

The imposition of disqualification has been found to be rationally related to the legitimate government purpose of preventing illegal activity within the Program (*Lugo*, 2009 WL 928136, at *4; *see also Nagi*, 1997 WL 252034, at *3) and the statute's strict liability scheme is rationally related to the Government's interest in preventing fraud in the program. *See Traficanti v. United States*, 227 F.3d 170, 175 (4th Cir. 2000) ("we hold that the statute's strict liability regime is rationally related to the government's interest in preventing fraud."); *Kim v. United States*, 121 F.3d 1269, 1274 (9th Cir. 1997) ("[c]learly permanently disqualifying store owners guilty of intentionally

trafficking in food stamps is rationally related to the legitimate goal of reducing the instances of trafficking violations.").

Despite Plaintiff's argument to the contrary, its substantive due process rights have not been infringed by imposition of disqualification as a penalty for trafficking. Plaintiff's allegation that Ms. Perdomo was not aware of what conduct was forbidden is belied by Plaintiff's signed certification that "trading cash for [SNAP] benefits, accepting [SNAP] benefits as payment for ineligible items, accepting [SNAP] benefits as payment on credit accounts, and knowingly accepting [SNAP] benefits from people not authorized to use them" all constitute violations. (Ex. B ("Certification and Signature ") to Mot. Summ. J. [Doc. # 14-6] at 2.)

Plaintiff has also not shown violation of procedural due process rights. In the instant case, Plaintiff's owner alleges that she never received the initial charging letter, but she does not dispute receiving the letter of disqualification, and she does not contest that the letter of disqualification informed her of her appeal rights or her ability to supplement the record.

"Plaintiff's procedural due process claim is without merit because plaintiff was afforded agency review and is being given *de novo* review by this Court." *Nagi*, 1997 WL 252034, at *3; *accord Duchimaza* at *14. Procedural due process is guaranteed "by the provision that gives aggrieved parties the right to seek a trial *de novo*." *Ibrahim*, 834 F.2d at 54. Accordingly, the imposition of disqualification did not infringe Plaintiff's substantive due process rights and the availability of review by trial *de novo* in the district court protected Plaintiff's procedural due process rights.

### D.    Penalty of Permanent Disqualification

Pursuant to 7 U.S.C. § 2021(a)(1)(A)-(C), an approved retail food store may be disqualified for violation of the provisions of the act. Under section 2021(b)(3)(B), such disqualification "shall

be . . . permanent upon . . . the first occasion or any subsequent occasion of a disqualification based on . . . trafficking in coupons . . . ." A store owner may request a civil monetary penalty in lieu of disqualification, but only if he presents a plan of compliance and makes further evidentiary showings to the FNS. *Id.*

Unlike the *de novo* review available for findings of liability, "the standard of review for the imposition of a [SNAP] sanction is a determination whether the [FNS]'s action was arbitrary or capricious, i.e., whether it was unwarranted in law or without justification in fact." *El Tepeyac Grocery, Inc. v. United States*, 515 F. App'x 55, 56 (2d Cir. 2013) (internal quotation marks and citations omitted). "The focal point for judicial review is the administrative record already in existence," thereby distinguishing this part of the Court's review from the more searching *de novo* review above. *Makey Deli, Inc. v. United States*, 873 F. Supp. 2d 516, 520 (S.D.N.Y. 2012) (internal quotation marks omitted). "'If the agency has followed its guidelines . . . the reviewing court may not overturn the decision as arbitrary and capricious.'" *Guzman v. U.S. Dep't of Agric. Food & Nutrition Serv.*, 931 F. Supp. 2d 488, 494 (S.D.N.Y. 2013).

Plaintiff alleges that the imposition of permanent disqualification in its case was arbitrary and capricious. However, the record demonstrates that the FNS followed its own procedures in determining that trafficking occurred. There is no evidence that Sky presented a plan of compliance to FNS and no evidence that it complied with the other requirements necessary for a civil monetary penalty. Given that the statute requires disqualification as the penalty for trafficking, the Court finds that the Agency did not act arbitrarily or capriciously in imposing such a penalty.

## IV.     Conclusion

For the foregoing reasons, the Court GRANTS Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 20th day of March 2017.